FRY'S EXOR'S.
*vs*
THROCKMORTON.

---

CHANCERY.

*Case* 141.

*June* 2.

The case stated.

## Fry's Ex'ors. *vs* Throckmorton.

ERROR TO THE LOUISVILLE CHANCERY COURT.

*Warranty. Failure of consideration.*

CHIEF JUSTICE ROBERTSON delivered the Opinion of the Court.

THOMAS W. FRY sold to *Aris Throckmorton* thirteen young slaves of three different families, but connected generally by different degrees of consanguinity. About two years after the sale and delivery, one of those slaves, *a young man named Jordan,* died of tubercular consumption.

A physician living in the Galt House, where *Jordon* and most of the other slaves were kept after *Throckmorton's* purchase of them, was of the opinion that shortly after they were delivered he "recognized the existence of

*constitutional* scrofula *in many of them,"* and also, that "*Jordan,* two years before his death, presented *symptoms* of scrofulous *taint."*

Several other persons who had known the slaves intimately from their birth, were of the opinion that all of them had always been remarkably sound and healthy, and testified that their parents and grand parents, paternal and maternal, had been apparently sound, and lived, most of them, to extreme old age.

*Jordan* was estimated in the sale at $1000, and on a bill filed for that purpose against Fry's non-resident representatives, the Chancellor decreed a perpetual injunction against a judgment for $1000 which they had obtained against *Throckmorton* for a balance of the consideration remaining unpaid.

The foundation of the bill and of the decree was the alledged unsoundness of *Jordan* when sold and delivered, and warranted to be sound.

In revising the decree the vague and indeterminate character of the testimony of the resident physician, before alluded to, the insidious nature of scrofula, and the diversity of professional opinion respecting its origin and progress, present difficulties which, if not insuperable, are at least vexatious.

But our matured judgment upon all the facts as exhibited in the record is, that they are insufficient to authorize the judicial deduction that *Jordan* was not, in the legal sense of the warranty, "*sound*" when sold and delivered by *Fry* to *Throckmorton.*

If, as physicians testified, scrofula be generally hereditary, still, as also testified, the hereditary taint may never, in the course of a long life, be developed in the form of fatal or injurious disease. Such a constitutional taint may only be a predisposition to scrofula in some of its various forms and locations of actual and developed disease. A scrofulous *dyathesis,* undeveloped in the form of insipient and progressive disease, is not scrofula itself.

Mere organic or constitutional predisposition to a particular malady is not unsoundness either in the popular, scientific or legal sense; if it were, there would perhaps

A mere organic or constitutional predisposition to a particular dis-

FRY'S EX'ORS.
*vs*
THROCKMORTON.

ease is not un-
soundness either
in its popular,
scientific or le-
gal sense.

be but few, if any, upon earth who are sound. There is, in very many, probably most persons, a peculiar tendency to, or susceptibility of disease of some kind or other. But this mere predisposition, undeveloped into actual disease by some exciting cause or by its own natural operation, cannot be considered unsoundness.

Our difficulty in this case arises from the uncertain import of the expressed opinion of the only person who testified as to the condition of *Jordan* shortly after the time of the contract.

Did he mean by "constitutional taint" any thing more than predisposition, or did he mean lurking scrofula in an incipient form of actual disease? He did not attempt to describe one single symptom—why did he not?

But whatever he did mean in that portion of the testimony, he meant of course, in that other portion of it in which he deposed that he "recognized the existence of constitutional scrofula in many of" the slaves. All this is very vague and unsatisfactory. But it seems that "many" of the slaves were apparently in *Jordan's* condition. Have they also died—or are they or any of them now unsound or apparently so? The record presents no satifactory answer to these important questions.

If none of the other slaves are now afflicted with scrof. ula, as a developed disease, is it not probable that, as they and *Jordan* were considered by the testifying physician as exhibiting the same symptoms of scrofulous taint, his scrofulous affection of the lungs was supervenient, and was excited or produced by some accidental and extraneous cause? And may it not be probable that the appearance of all, as interpreted by the doctor, resulted from an essential change in their habits, occupations and mode of living, after they were translated from an airy country residence to a large hotel in a crowded city?

Whatever may be said or thought by medical men as to the hereditary character of scrofula, there can be no doubt either that scrofula may originate from accidental causes and become fatal without transmission, or that an hereditary taint may never assume the form of disease.

And even the professional testimony in this case proves this if it proves any thing.

But the facts proved by the witnesses of the executors, considered in connection with those to which the attending physician testified, authorize the deduction that the scrofulous taint of which he spoke, was not scrofula in the form of incipient or developed disease—and that *Jordan* himself was not unsound at the date of the warranty, but died more than two years afterwards, of a disease originating after the sale from local or other causes, which either produced tubercular consumption or excited into that fatal form of scrofula a latent predisposition which itself was not unsoundness, and never would have thus terminated without the operation of those or similar fortuitous circumstances.

We feel constrained to the conclusion that the evidence, taken altogether and properly considered, is insufficient to prove with judicial certainty that *Jordan* was unsound when *Fry* sold him to *Throckmorton*. And we are, therefore, of the opinion that the complainant has not, as he ought to have done, shown satisfactorily that he is entitled to the relief sought by his bill and decreed to him by the Chancellor.

The Chancellor's decree is therefore reversed, and the cause remanded with instructions to dismiss the bill.

*Pirtle and Owsley & Goodloe* for plaintiff; *Duncan* for defendants.

Proof of unsoundness, and opposing proof contrasted, and found insufficient to prove unsoundness.